DECISION
Before this Court is an appeal from an August 27, 2004 decision by the Zoning Board of Review for the Town of Scituate (the Board), denying a request from Sally Simms (the Applicant) for dimensional variances to construct a single-family residence. The Applicant timely appealed the decision to this Court. Jurisdiction is pursuant to G.L. 1956 § 45-24-69.
 Facts and Travel
The vacant lot at issue is located in the Town of Scituate at the intersection of William Henry Road and Central Avenue, otherwise known as Lots 18 on Tax Assessor's Plat 13. SeeDimensional Variance Application. The property is a substandard Lot of Record created by deed in 1958, and it is situated in an RS-120 zoning district.[1] Decision of the Board, filed August 27, 2004, at 2 and 5 (Decision II).[2] The land comprises of a triangular-shaped lot that is 10,885 square feet in size. Id. at 2. The building envelope consists of approximately ten-square feet. Decision I at 2.
The Applicant sought dimensional relief from three setback requirements for a "pre-existing non-conforming lot of record."[3] Dimensional Variance Application, at 2. The Applicant proposed constructing a three-bedroom residence with a two-car garage. Decision II at 3. A duly noticed hearing was conducted on July 27, 2004.
At the hearing, Plan Commission Member David Provonsil read a letter into the record. Tr. at 3. The letter was from the Commission, and it concluded that "the proposal is in conformance with our Comprehensive Plan; as long as the proposed dwelling is consistent with the neighborhood and all environmental permits are obtained." Id. This was the same letter that the Plan Commission introduced at the hearing on the Applicant's previous Application for dimensional relief. Id.
Marc Boyer, a registered professional land surveyor, then testified as an expert for the Applicant. Id. at 4. He testified that he had been engaged by the Applicant to survey the property to determine the feasibility of building a residence with an adequate sanitary system on the lot. Id. at 5. He stated that the lot consists of 10,885 square feet, and that it is bisected at the easterly end of the property by a turn around that is used by the Town. Id. at 6-7. However, his search of the Land Evidence Records reveals that the Applicant never has relinquished to the Town any rights in the turn-around portion of the property. Id. at 19.[4] He further testified that his research also revealed that "the lot was created by deed dated July 7, 1958. Id. at 20. Consequently, it existed before the adoption of the Zoning Code. Id. at 7.
Mr. Boyer said that the Applicant is proposing to build a 1200 square foot, single-family residence. Id. at 7-8. The building would cover approximately 11 percent of the lot and, as such, it is within the zoning coverage requirements. Id. at 8. Mr. Boyer indicated that the Application is subject to any appropriate environmental permits, but that the only issue before the Board is dimensional relief from the setback requirements. Id. at 9. He further indicated that the proposed use is consistent with the code, would not unduly disrupt the neighborhood and is the least relief necessary. Id. at 10. He then stated that the size and configuration of the lot amounted to a "real hardship." Id. at 11.
After Mr. Boyer concluded his testimony, various neighbors testified against the Application. Gail Ragosta expressed concern that the Individual Sewage Disposal System might pose a threat to the well water system. Id. at 12. Joseph Maggio testified that he did not "understand why we're back here because [the Applicant] is putting up a smaller house" on what he claimed was an unbuildable lot. Id. at 14. He also stated that he believed the Applicant created her own problem when she subdivided the property. Id. Randy DiSano questioned whether the proposed "little shack" was "appropriate" for the neighborhood and suggested that it would affect property values. Id. at 35-36. Gwen Stearn believed that if the turn-around were to be eliminated, it would pose a safety issue for school buses. Id.
at 39. Elizabeth Maggio argued that by subdividing the lot, the Applicant created her own hardship and should not be entitled to variance relief. Id. at 40-41. Lisa Rosa Smith opined that a guardrail would have to be erected to protect the house from cars sliding off the road in bad weather, and that such guardrail would pose a traffic hazard to drivers by blocking their view as they turn the corner. Id. at 47.
At the conclusion of the hearing, the Board voted to deny the Application. Id. at 64-65. In its decision, the Board concluded that the Applicant had "not shown a substantial and material change in circumstances, where the only change in the application is in the overall size of the house proposed, a difference of 792 square feet."[5] Decision II at 4.
Despite finding that the Application was precluded by the doctrine of administrative finality, the Board then addressed the merits of the proposal and concluded that variance relief should be denied because the Applicant created her own hardship by creating a substandard lot in 1958, and that "any new construction must comport with currently applicable law."Decision II at 5. The Applicant now seeks review of that decision. Additional facts will be supplied as pertinent to this appeal.
 Standard of Review
The Superior Court's review of a zoning board decision is governed by § 45-24-69(d). Section § 45-24-69(d) provides:
 "The court shall not substitute its judgment for that of the zoning board of review as to the weight of the evidence on questions of fact. The court may affirm the decision of the board of review or remand the case for further proceedings, or may reverse or modify the decision if substantial rights of the appellant have been prejudiced because of findings, inferences, conclusions or decisions which are:
 (1) In violation of constitutional, statutory, ordinance or planning board regulations provisions;
 (2) In excess of the authority granted to the zoning board of review by statute or ordinance;
 (3) Made upon unlawful procedure;
 (4) Affected by other error of law;
 (5) Clearly erroneous in view of the reliable, probative, and substantial evidence of the whole record; or
 (6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion."
When reviewing a decision of a zoning board, the trial justice "must examine the entire record to determine whether `substantial' evidence exists to support the board's findings."DeStefano v. Zoning Bd. of Review of Warwick, 122 R.I. 241,245, 405 A.2d 1167, 1170 (1979). The term "substantial evidence" has been defined as "such relevant evidence that a reasonable mind might accept as adequate to support a conclusion, and means [an] amount more than a scintilla but less than a preponderance."Lischio v. Zoning Bd. of Review of North Kingstown,818 A.2d 685, 690 n. 5 (R.I. 2003) (quoting Caswell v. George ShermanSand Gravel Co., Inc., 424 A.2d 646, 647 (R.I. 1981)).
In conducting its review, the trial justice "may `not substitute its judgment for that of the zoning board of review as to the weight of the evidence on questions of fact.'" Curran v.Church Community Housing Corp., 672 A.2d 453, 454 (R.I. 1996) (quoting G.L. 1956 § 45-24-69(d)). The deference given to a zoning decision is due, in part, to the fact "that a zoning board of review is presumed to have knowledge concerning those matters which are related to an effective administration of the zoning ordinance." Monforte v. Zoning Bd. of Review of EastProvidence, 93 R.I. 447, 449, 176 A.2d 726, 728 (1962).
Finally, it is axiomatic that "a municipal board, when acting in a quasi-judicial capacity, must set forth in its decision findings of fact and reasons for the actions taken." Kaveny v.Town of Cumberland Zoning Bd. of Review, 875 A.2d 1, 8 (R.I. 2005) (quoting Sciacca v. Caruso, 769 A.2d 578, 585 (R.I. 2001)). These findings are required "so that zoning board decisions may be susceptible of judicial review." Kaveny,875 A.2d at 8 (internal quotations omitted.) In situations where a zoning board "fails to state findings of fact, the [C]ourt will not search the record for supporting evidence or decide for itself what is proper in the circumstances." Id. (quotingIrish Partnership v. Rommel, 518 A.2d 356, 359 (R.I. 1986)).
 The Doctrine of Administrative Finality
In its decision, the Board compared the Applicant's previous Application with the current one. The Board found that there existed no substantial or material change in circumstances because the Applicant was seeking identical relief; namely, a three-bedroom house with a two-car garage, and that only difference between the two Applications is that the second residence would be smaller. Consequently, the Board concluded that the Application was precluded under the doctrine of administrative finality.
Pursuant to the doctrine of administrative finality, "when an administrative agency receives an application for relief and denies it, a subsequent application for the same relief may not be granted absent a showing of a change in material circumstances during the time between the two applications." JohnstonAmbulatory Surgical Associates, Ltd. v. Nolan, 755 A.2d 799, 808
(R.I. 2000) (citing Audette v. Coletti, 539 A.2d 520, 521-22
(R.I. 1988)). The goal of this doctrine "is to promote consistency in administrative decision-making, such that if the circumstances underlying the original decision have not changed, the decision will not be revisited in a later application."Johnston Ambulatory Surgical Associates, Ltd., 755 A.2d at 810. Thus, "[w]hile the rule is sound, it is operative only if the relief sought in each case is substantially similar." May-DayRealty Corp. v. Board of Appeals of City of Pawtucket,267 A.2d 400, 107 R.I. 235, 402 (R.I. 1970). The doctrine of administrative finality does not apply in cases where the previous decision was invalid. See Johnston AmbulatorySurgical Associates, Ltd., 755 A.2d at 808 (citing Hester v.Timothy, 108 R.I. 376, 384, 275 A.2d 637, 641 (1971)).
An applicant has the burden of showing a substantial or material change in circumstances between the first and second application. See Johnston Ambulatory Surgical Associates,Ltd., 755 A.2d at 809. In meeting that burden, it must be remembered that
 "[w]hat constitutes a material change will depend on the context of the particular administrative scheme and the relief sought by the applicant and should be determined with reference to the statutes, regulations, and case law that govern the specific field. The changed circumstances could be internal to the application, as when an applicant seeks the same relief but makes important changes in the application to address the concerns expressed in the denial of its earlier application. Or, external circumstances could have changed, as when an applicant for a zoning exception demonstrates that the essential nature of land use in the immediate vicinity has changed since the previous application. Finally, there is a burden on the administrative decision-maker to articulate in its decision the specific materially changed circumstances that warrant reversal of an earlier denial of the relief sought." Id. at 811 (emphasis added).
When an administrative agency makes a finding that there has been a material change in circumstances, and then points to evidence in support of that finding, "a trial justice would likely abuse his or her discretion by independently reviewing the evidence and rejecting the department's finding." Id. at 813. An administrative agency's discretionary decision that "the requested relief in both applications is substantially the same . . . will be disturbed only if its discretion was abused."Driscoll v. Gheewalla, 441 A.2d 1023, 1027 (Me. 1982).
In Driscoll v. Russi 441 A.2d 1023 (Me. 1982), the Supreme Judicial Court of Maine faced a situation similar to that of the instant case. There, the applicants owned an undersized, corner lot with a buildable envelope of seventeen by twenty feet. Id.
at 1025. Their first application for dimensional relief was denied. Id. A modified plan was approved less than one month later. Id. The Superior Court vacated the board's decision on grounds that a rehearing within two years of an application's denial was barred by the ordinance, and that the applicants had failed to demonstrate "undue hardship" in order to overcome strict application of this provision. Id.
The Supreme Judicial Court disagreed; instead, the court held that
 "[e]ven in the absence of an express prohibition in a zoning ordinance, the general rule is that a board of zoning appeals or board of adjustment may not entertain a second application for a variance concerning the same property after a previous application has been denied, unless a substantial change of conditions had occurred or other considerations materially affecting the merit of the subject matter had intervened between the time of the first adjudication and the subsequent application." Id. at 1027.
The court then concluded that the new proposal substantially differed from the first plan because the building would be set back from one street by twenty-two feet instead of ten feet, and from the other street by fifteen feet instead of ten feet. Id.
at 1028. Furthermore, "the building itself was reduced to reasonable limits from what the Board had considered excessive use of space not contributing to living accommodation. . . ."Id. The court concluded that the board was not clearly wrong in finding substantial differences between the applications. Id.
That is because "[t]he objectionable features of the old plan had been removed and the Board had the full authority to entertain the new application, notwithstanding the two-year prohibition of the ordinance."
In a similar case, the Oregon Court of Appeals considered whether the submission of a variance application within six months of the denial of a previous application was in derogation of the applicable zoning ordinance and, thus, should not have been considered by the City Council and Planning Permission.Peterson v. City Council for the City of Lake Oswego,574 P.2d 326, 330-31 (Or.App. 1978). The court concluded that a second application to expand a public library differed in at least four significant respects:
 "(1) It eliminated the front setback request entirely and reduced the rear setback request by seven feet;
 (2) It reduced the parking lot setback by four feet;
 (3) It proposed a building covering less of the lot; and
 (4) It reduced the overall height of that building by six to ten feet." Id. at 331.
The court held that the trial court erroneously reversed the administrative agency. Id. In doing so, the court stated that "[t]he City Council and Planning Commission had the authority to consider [the second application] because the circumstances upon which [the first application] might have been denied had changed." Id. See also Russell v. Bd. Of Adjustement ofBorough of Tenafly, 155 A.2d 83, 88 (N.J. 1959) (holding that even though there were no allegations of changed conditions, the board did not abuse its discretion in considering a second application on its merits where the new application provided for an increase in the proposed setback and a decrease in the lot coverage).
A. Denial of the Second Application based upon AdministrativeFinality
The Zoning Ordinance for the Town of Scituate (the Ordinance) establishes dimensional regulations for each zoning district.See Article III, Section 1 of the Ordinance. In an RS-120 District, the minimum setbacks are as follows: fifty feet for front yards; sixty feet for rear yards; and thirty-five feet for side yards. Id. Maximum lot coverage is fifteen percent of the property. Id.
The record reveals that the Applicant submitted successive Applications seeking dimensional relief to construct a three-bedroom, two-car garage residence. In her first Application, she sought dimensional relief from all of the setback requirements, as well as relief from the coverage requirements. Decision I at 3. The proposed residence would have had a front-yard setback of ten feet, side-yard setbacks of twenty feet and a rear-yard setback of fifteen feet. Id. Thus, the Applicant sought forty feet of relief for the front-yard, fifteen feet of relief for the side-yards and forty-five feet of relief for the rear-yard. Id. In addition, the sixty-two foot by thirty-six foot building would have measured 2232 square feet and would have exceeded the Ordinance's coverage requirements by over five percent. Id. As a result, in addition to setback relief, the Applicant sought relief from the Ordinance's coverage requirements.
In denying the first Application, the Board found that "granting dimensional variances to benefit a single lot in every possible dimension, including lot coverage, is contrary to the public interest." Id. at 7. The Board further found that the Applicant had not sought the least relief necessary "because she declined to propose a smaller structure." Id. at 7. It also found that she had created her own hardship by subdividing the lot in 1958. Id. at 6. Finally, after noting that substandard lots of record must be no less than one hundred feet in width, the Board concluded that "[t]he lot at issue is only ninety (90) feet wide at its widest point, and is therefore not entitled to relief under the Code. Id. at 7. The Applicant timely appealed the decision, but later withdrew her appeal. Thereafter, she filed a new Application for permission to construct a smaller structure.
In her second Application, the Applicant again sought dimensional relief, but this time she did not seek relief from the coverage requirements. Decision II at 1 and 3. The proposed residence would measure forty-five feet by 26.67 feet for a total of 1203 square feet, and it would cover only eleven percent of the lot.[6] Id. 2-3. The west side of the property would conform to the side-yard setback requirements.[7] Id. at 3. The proposed side-yard setback on the other side would be fifteen feet (as opposed to twenty feet in the first Application), and the proposed front-yard setback would be 17.8 feet (as opposed to ten feet in the first Application). Id. at 3.
After noting the aforementioned facts, the Board found that the Applicant "has not shown a substantial and material change in circumstances, where the only change in the application is in the overall size of the house of the house proposed, a difference of 792 square feet." Id. at 4. The Board then adopted the findings of fact from its previous decision. Id. This Court concludes that the doctrine of administrative finality is inapplicable to the second Application.
During the hearing on the second Application, Town Solicitor Dianne Izzo compared both Applications and then stated that "the size of the house was fairly significantly different." Tr. at 50. Board Member Kenneth Borden asked the Board "is there really material change and a significant change, because they're asking for the same relief?" Id. at 51. A Board Member responded: "It's still a three-bedroom house, it is not significant."Id.[8] Later Mr. Borden stated that "there may be a difference between 20 feet and 30 feet or 30 feet and 40 feet, but what difference does it make because it's (unintelligible) anyway, you know." Id. Later, the following colloquy took place:
 "MRS. IZZO:. . . . Consistent with the doctrine of administrative finality as enumerated by the Supreme Court of Rhode Island after a final decision by the zoning board a successive similar application may not be entertained unless the applicant can show a substantial and material change in circumstances since the date of the prior application.
 BOARD MEMBER: That's what I'm saying.
 MRS. IZZO: The Board can decide if they've met that burden or not.
 MR. BORDEN: Yeah, so the only question here is whether it's a similar application.
 MRS. IZZO: Substantial and material change in circumstances. (unintelligible)
 MRS. IZZO: Right.
 MR. BORDEN: If it's similar to prior I don't see any material change of circumstances." Id. at 55.
It appears from the foregoing that despite Mrs. Izzo's attempt to explain the doctrine of administrative finality, the Board was confused about its applicability. It further appears that the Board believed that an application seeking relief similar to a previously denied application automatically means that there was no material or substantial change in circumstances. Such an interpretation would amount to an erroneous construction of the doctrine because in order to trigger the doctrine in the first instance, the subsequent application must seek the same or similar relief. See Audette v. Coletti, 539 A.2d 520, 521-22
(R.I. 1988) ("Where a zoning board hears an application for relief and denies it, the doctrine of administrative finality bars a subsequent application for the same relief absent a showing of a change in material circumstances in the time intervening between the two applications.") (Emphasis added.)
In this case the Board properly determined that the Applicant was seeking similar relief; namely, a three-bedroom residence with a two-car garage. However, the record reveals that it ignored its own finding concerning the differences between the two Applications.[9] The second Application sought permission to build a residence that was approximately forty-six percent smaller than the structure that she originally proposed. Moreover, unlike the first Application, which sought relief from the Ordinance's coverage provisions, the second Application was well within those provisions. The second Application also sought less relief from the setback requirements. The first Application sought relief from all of the setback requirements; whereas, the second Application complied with one, and perhaps two, setback requirements.[10] The second Application proposed increasing the front-yard set back by 7.8 feet, and while one side-yard setback actually would decrease by five feet, the other side-yard setback would be in conformance with Ordinance. These differences amount to substantial and material changes in circumstances; consequently, the Board's finding that the doctrine of administrative finality applied to the second Application was not supported by the probative evidence of record and constituted error of law.
B. The Board's Decision
Although the Board concluded that the second Application was barred by the doctrine of administrative finality, it nevertheless considered the merits of the Application and again concluded that the Applicant had created her own hardship by subdividing the lot. Id. at 5. This constituted error.
Before granting a variance, a zoning board is required to consider and enter into the record satisfactory evidence of the following standards:
 "(1) That the hardship from which the applicant seeks relief is due to the unique characteristics of the subject land or structure and not to the general characteristics of the surrounding area; and is not due to a physical or economic disability of the applicant, excepting those physical disabilities addressed in § 45-24-30(16);
 (2) That the hardship is not the result of any prior action of the applicant and does not result primarily from the desire of the applicant to realize greater financial gain;
 (3) That the granting of the requested variance will not alter the general character of the surrounding area or impair the intent or purpose of the zoning ordinance or the comprehensive plan upon which the ordinance is based; and
 (4) That the relief to be granted is the least relief necessary.
 (d) The zoning board of review shall, in addition to the above standards, require that evidence is entered into the record of the proceedings showing that: . . . in granting a dimensional variance, that the hardship suffered by the owner of the subject property if the dimensional variance is not granted amounts to more than a mere inconvenience. The fact that a use may be more profitable or that a structure may be more valuable after the relief is granted is not grounds for relief." Section 45-24-41(c) and (d).
In its decision, the Board made only one finding: that the Applicant had created her own hardship when she subdivided the lot in 1958. It then concluded that "[e]ven though the lot was created prior to the introduction of the Zoning Ordinance, any new construction must comport with currently applicable law."Decision II at 5.
Article IV, Section 3 of the Ordinance regulates substandard lots of record. It provides in pertinent part:
 "Where no adjacent land is in the same ownership so as to form at least a lot of the minimum lot size and dimensions for the district which was of record on the effective date of this ordinance [December 30, 1965] may be used for a permitted use, or use permitted by special use permit if a special use permit is granted, provided that such lot shall have minimum width of one hundred (100) feet." Article IV, Section 4 of the Ordinance (emphasis added.)
According to the Ordinance, a substandard lot may be used for a permitted use, in this case a residence, provided it (a) was recorded prior to the effective date of the Ordinance; (b) is at least 10,000 square feet; and, (c) has a minimum width of 100 feet.
It is undisputed that the lot in this case was recorded in 1958 and is over 10,000 square feet. It is also undisputed that the subdivision occurred prior to the enactment of the Ordinance and that it is a preexisting, nonconforming lot of record. Because the Applicant's action in subdividing the original lot was not prohibited by law, the resulting substandard lot should not now be considered a self-created hardship. See Sciacca v. Caruso,769 A.2d 578, 584 (R.I. 2001) (observing that the self-created hardship rule "seems to be most properly employed where one acts in violation of an ordinance and then applies for a variance to relieve the illegality") (quoting Patrick J. Rohan, Zoning andLand Use Controls § 43.02[6] at 43-66 (1998)). This Court concludes that the Board erred in finding that the Applicant created her own hardship when she made a substandard lot of record by subdividing a larger lot in 1958, because such action could not have been in violation of an Ordinance that did not exist.
Furthermore, the Board's finding that "any new construction must comport with currently applicable law" is in violation of ordinance and statutory provisions. Pursuant to such a finding, nobody ever could receive dimensional relief because, by definition, such relief never would "comport with currently applicable law." See Sako v. Delsesto, 688 A.2d 1296, 1298
(R.I. 1997) (noting that "a `true' variance is relief to use land for a use not permitted under the applicable zoning ordinance" and that "[a] deviation is relief from restrictions governing apermitted use such as lot-line setbacks, limitations on height, on-site parking, and minimum frontage requirement") (emphasis added). This Court will not construe the Ordinance to reach such an absurd result. See State v. Flores, 714 A.2d 581, 583
(R.I. 1998) ("This Court will not construe a statute [or an ordinance] to reach an absurd result."). Finally, although it appears that the lot may be only ninety feet wide, "in cases involving ordinance provisions which are merely regulatory of a permitted use, a board of review may permit deviations therefrom upon a showing that a literal enforcement of such regulatory provisions would have an effect so adverse as to preclude the full enjoyment by the owner of the land of the permitted use."Lindberg's, Inc. v. Zoning Bd. of Review of the City of EastProvidence, 106 R.I. 667, 668, 262 A.2d 628, 629 (1970).
 Conclusion
Due to the paucity of findings, this Court is unable to review "adequately" the Board's decision to deny the Application for dimensional relief. See Kaveny, 875 A.2d at 8. Consequently, this Court remands the case to the Board and directs it to make the requisite findings in accordance with Sections 45-24-41(c) and (d). See Rossi v. Employees' Retirement System of State,
No. 2004-364-M.P. slip op. at 11 (R.I., filed April 13, 2006) (reversing the sole finding of the Employees' Retirement Board and remanding the case to the board to consider all of the evidence in the record). This Court retains jurisdiction.
Counsel shall submit an appropriate order consistent with this opinion.
[1] While the Dimensional Variance Application states that the property is located in an RR-120 zoning district, it appears as if this zoning designation may have been a typographical error.
[2] The Board previously denied dimensional relief for the same property. The decision on the first Application hereinafter shall be referred to as Decision I, and the decision presently under consideration hereinafter shall be referred to as Decision II.
[3] The Application stated that the proposed structure would violate the setback requirements on one side, as well as on the front and on the rear of the property.
[4] The legal status of this portion of the property is not at issue in this case.
[5] The Board found that the Applicant previously had sought permission to construct a 1995 square foot residence. By subtracting 1220 square feet from that figure, the Board reached a figure of 792 square feet, the alleged difference between the two proposals. However, Decision II shows that the Applicant actually sought to construct a 2232 square foot residence. The difference between 2232 square feet and 1200 square feet is 1032 square feet, not the 792 square feet as found by the Board.
[6] It is not entirely clear whether the proposed residence would be 1200 square feet or 1203 square feet; however, this minor discrepancy does not affect the outcome of this decision.
[7] No evidence was presented concerning the rear-yard setback.Decision II at 4. During the hearing, counsel for the Applicant argued that because the lot was triangular in shape, it was not possible to determine a rear-yard setback. Tr. at 22-23. Furthermore, he argued that Article IV, Sections 3 and 4 of the Ordinance should be construed together in order to determine the setback requirement for the side that would be adjacent to the street. Article IV, Section 4 provides that for corner lots, "[a]ll dimensional regulations of article III shall apply, except that the side yard which is adjacent to a street shall have a depth equal to one-half (1/2) the sum of the required side yard and front yard depths for the district." Article IV, Section 3 regulates substandard lots of record. It provides: "All yard dimensions of such [substandard] lot shall conform to the provisions of the district, except that the side yard depth may be reduced to ten (10) feet for any lot less than twelve thousand five hundred (12,500) square feet in area." Article IV, Section 3. By counsel's calculations, the applicable side-yard setback requirement for the side adjacent to the street would be thirty feet (fifty plus ten divided by two). The Board impliedly rejected this argument when it calculated that the side-yard setback requirement should be 42.5 feet (fifty plus thirty five divided by two). See Decision II at 3.
[8] The hearing was transcribed from tape, and not all of the speakers are identified by name.
[9] It is interesting to note that in its first decision, the Board appeared quite critical of the Applicant for not proposing a smaller structure. See Decision I at 2, 6 and 7. Even though the Applicant subsequently proposed a smaller structure, the Board still denied her Application.
[10] Considering the abundance of substantial and material changes in the record, this Court need not review the Applicant's contention that she also satisfied the rear-yard setback requirement. See note 5 supra.